**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL NO. 21-12 (DRD)** |
| *Plaintiff,* | |
| v. | |
| **[3] ONYX YERIELLE OLIVERA-RIVERA,** | |
| *Defendant.* | |

**OPINION AND ORDER**

Pending before the Court is Codefendant, Onyx Y. Olivera-Rivera's *Amended Motion to Suppress* (Docket No. 54). The United States of America filed its respective *Response in Opposition* thereto. *See* Docket No. 56. The Defendant is essentially seeking "the suppression of all illegal evidence obtained and therefore, the dismissal of the Indictment because it was obtained in violation to the US Constitution." Docket No. 54 at 1. According to Olivera, as this was a traffic stop due to a traffic violation, to wit, unauthorized window tints, there was no court order issued for his arrest, to search the vehicle he was driving or to seize his phone. *See id.* Therefore, as "no special circumstances exist to justify a warrantless search as to all counts of the indictment" the search was unreasonable under the Fourth Amendment. *See id.* at 5. Accordingly, all subsequent efforts by the authorities are also Fourth Amendment violations.

In opposition, the Government argues that the defendant has "failed to establish an expectation of privacy over the vehicle searched or the evidence seized. Thus, he fails to reach the threshold necessary for a hearing on his motion." Docket No. 56 at 3. For the reasons stated herein, the Court hereby **DENIES** Olivera's *Amended Motion to Suppress. See* Docket No. 54.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The case at bar stems from a traffic stop conducted by Puerto Rico Police Department (hereinafter, "PRPD") Agents on a vehicle driven by Olivera. As a result thereof, the Agents discovered that the Defendant had firearm magazines, multiple rounds of ammunition, firearm parts and accessories in his possession, namely: (141) 7.62x39 caliber rounds of ammunitions; (8) 2.23 caliber rounds of ammunitions; (86) .40 caliber rounds of ammunitions; (2) Glock magazine 9mm empty; Pistol magazine .40 empty; (2) apparently silencer barrel; firearm part accessories; and firearms plastic box. *See Complaint*, Docket No. 1-1 at ¶ 4. During the traffic stop, the PRPD Agents confirmed that Olivera did not have permission or license to possess these items, and was accordingly, arrested on local charges.

Thereafter, the PRPD Agents contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives (hereinafter, "ATF") Agents and provided information as to the Defendant's arrest, items found in his possession and any other information obtained as a result thereof. *Id.* at ¶ 5. On December 15, 2020, ATF Agents interviewed Olivera but only after reading him his Miranda warnings, which he alleged to have understood. As such, he agreed to speak to the ATF Agents without counsel present. *Id.*

Olivera was ultimately arrested on December 21, 2020. *See* Docket No. 3. A grand jury returned an *Indictment* shortly thereafter. *See* Docket No. 12. On January 25, 2022, a *Superseding Indictment* was filed by the Government. *See* Docket No. 92. The Defendant has been charged with the following offenses: conspiracy to engage in the business of dealing with firearms without a license, in violation of 18 U.S.C. § 371 (hereinafter, "Count One"); and aiding and abetting in

willfully engaging in the unlicensed business of dealing in firearms in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D) and 2 (hereinafter, "Count Four"). *See* Docket No. 92.

Generally, "[e]videntiary hearings on motions to suppress are required only where a defendant makes a sufficient showing that the evidence seized was the product of a warrantless search that does not fall within any exception to the warrant requirement. The burden is on the defendant to allege facts, 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. U.S. v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996). Moreover, PRD Local Criminal Rule 147(a) provides that "[e]very dispositive motion shall include citations and supporting authorities. Affidavits and other documents setting forth or evidencing facts on which the motion is based shall be filed with the motion."

Upon review, the Court finds that Olivera's motion to suppress is devoid of evidence to support his allegations other than the affidavit included when amending the motion to suppress. Ultimately, the Court finds that the legal issues surrounding this request have been sufficiently briefed. Accordingly, the Court will make its ruling in writing without holding an evidentiary hearing.

## II.    LEGAL ANALYSIS

### A.    *Legality of the Traffic Stop and Seizure*

The Fourth Amendment prohibits unreasonable searches and seizures. Terry v. Ohio, 392 U.S. 1, 9 (1968). Searches conducted without a warrant supported by probable cause are presumptively unreasonable absent a recognized exception to the warrant requirement. U.S. v. McGregor, 650 F.3d 813, 820 (1st Cir.2011). For instance, observation of a traffic offense can provide such an exception. *Id.*

Temporary detention of a driver is reasonable where probable cause exists that a traffic violation has or may have occurred. The police may stop a vehicle if "it was objectively reasonable for the officer[ ] who observed [the] vehicle to conclude that a traffic violation had occurred." U.S. v. Southerland, 486 F.3d 1355, 1358 (D.C.Cir.2007). Moreover, "[t]he police may initiate a stop even if the traffic violation is a minor one." Id. at 1359. In fact, "[a]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." McGregor, 650 F.3d at 820. Examples of minor traffic violation stops, which circuit courts have determined create probable cause to stop a vehicle, include an improperly displayed license plate, Southerland 486 F.3d at 1359, an illegal "tinted tag cover", U.S. v. Watson, 717 F.3d 196 (D.C. Cir. 2013), and a seatbelt violation, U.S. v. Tiru-Plaza, 766 F3d 111 (1st Cir. 2014). An officer can then conduct pat/frisk searches of the occupants and search the interior of the vehicle for protective purposes only if "he has some articulable, reasonable suspicion that the persons stopped may be dangerous." McGregor, 650 F.3d at 820. The Court, therefore, concludes that a traffic stop due to a tinted windows violation constitutes a proper search.

The First Circuit has identified a two-step inquiry for assessing the reasonableness of searches conducted in the context of a traffic stop. The first inquiry is whether the officer "was justified in making the stop," and second, whether "the protective search [was] reasonably related to the events justifying the stop, factoring in what happened and what [the officer] learned during the encounter." Id.

Here, the Defendant challenges the legality of the December 15, 2020 traffic stop by arguing that it was allegedly "a road blockage stop, [wherein the PRPD] stopped the vehicle that defendant was driving." Docket No. 54 at 1. However, according to the Defendant, on the date

of his arrest, "[n]o blockade was announced. The Police were at street #848 intersection with Calle Uruguay Carolina, PR. There were approximately 5 to 5 Motorized officers that were hidden and were stopping vehicles." *Id.* In fact, Olivera contends that on the day of the events, "federal judge Gelpi had ordered to stop all the blockades that the police were carrying out." *Id.*; *see United States of America v. Commonwealth of Puerto Rico,* civil no. 12-2039 (FAB). Docket No. 1647[1].

It is worth noting that the Defendant's version of facts is inconsistent as first, he claims to have been stopped due to a blockade with 5-6 motorized officers hidden and stopping vehicles, while then alleging that "the alleged traffic stop, was just a subterfuge to stop defendant and to search his vehicle. The Police of Puerto Rico was following the defendant for hours and through different cities (Bayamon, San Juan, and Carolina)." Docket 56 at 5. But ultimately, the Defendant's allegations as to the circumstances surrounding the traffic stop constitute an issue of credibility that the Court cannot resolve through a motion to suppress. Hence, we move forward.

According to the Defendant, after being intervened by the PRPD, the Officer "opened defendant's driver side door and started looking inside the vehicle. He requested the license and registration while looking inside the vehicle." *Id.* at 2. Thereafter, the PRPD Officer "saw a men's bag located between the console and passenger's seat and ask[ed] the defendant what was in the bag, the defendant responded that there was nothing in the bag, immediately the Police

---

[1] The Court notes that although the Defendant refers to Hon. Gustavo A. Gelpí's Order Re: Promotions and Roadblocks as Exhibit No. 1 of the *Amended Motion to Suppress*, the document was not included in this filing. However, the Court takes judicial notice of this fact, as this is a public record from the U.S. District Court for the District of Puerto Rico that can be easily corroborated.

Officer, without probable cause and/or search warrant, grabbed the bag and looked inside the bag, without the defendant's authorization and over his objection." *Id.* As a result thereof, the PRPD found a magazine, which led to the Defendant's arrest. *Id.* The PRPD also seized the Defendant's cellphone "without probable cause and/or a search warrant." *Id.*

Olivera was then taken to the San Juan Police Precinct, and subsequently turned over to Federal Agents. *Id.* According to the Defendant, "[t]he Federal Agents also seized [his] phone without a warrant." *Id.* at 3. No charges were filed by the PRPD. However, Olivera was questioned by the federal authorities for "over 11 hours" of being arrested, and was ultimately released. However, the Defendant argues that the Federal Agents kept his cellular phone without a court order. *Id.* Then, Olivera claims to have been told that he would be released if he signed certain documents, "which the defendant signed without reading, because he was tired and wanted to go home." *Id.* Charges were subsequently filed with the information obtained as a result of the search of the Defendant's phone. *Id.*

The Government's version of facts is noticeably different from the defendant's. Firstly, according to the Government, "[o]n December 15, 2020, at around 1:15pm, two motorized [PRPD] agents were patrolling areas with high crime incidence in Carolina." Docket No. 56 at 1. Among those places was Los Mirtos Public Housing Project, located in Uruguay street in the Municipality of Carolina, Puerto Rico. *See id.* As the agents were taking a break from the "midday sun," one of the agents noticed a gray Lexus RX300 with illegal window tints. *See id.* As evidenced by the Ticket for Administrative Infraction filed in support thereof, the Lexus RX300's tints had 15% transmission of visible light. *See id.*; *see also* Exhibit No. 1. However, under Puerto Rico Law,

the use of tinted windows with percentage of visible light transmission of less than thirty and five

percent (35%) constitutes traffic violations punishable by a fine. *See* PR Laws Ann. Tit. 9, § 5285[2].

Accordingly, a PRPD agent proceeded to intervene with the Defendant through a routine

traffic stop for violations related to Puerto Rico Law 22. *See* Docket No. 56 at 1. As customary in

these types of interventions, the PRPD agent requested the driver's license and vehicle

registration from the Defendant. *See id*. The vehicle was not registered on the Defendant's name.

*See* Docket No. 56, Exhibit No. 2. When Olivera opened his fanny pack to retrieve the documents,

"the agent noticed that inside the fanny there was a rifle magazine." Docket No. 56 at 1. The

Government contends that "[t]he PRP[D] agent's training and experience, as well as common

sense, caused him to believe that a rifle magazine was accompanied by a rifle." *Id.* As a result

thereof, the Defendant was asked whether he had a firearm's permit. *See id.* As he responded

that he did not, he was asked to step out of the vehicle, read his *Miranda* rights and placed under

arrest. *See id.* The PRPD Agent searched the vehicle at the location of the intervention and in the

Defendant's presence, and found "141 rounds of 7.62 ammo, 8 rounds of 2.23 ammo, 86 rounds

of .40 ammo, 3 magazines 9mm, 1 magazine .40, 1 magazine 5.56, 2 silencers, 1 gun barrel, 1

silencer, 1 picatini, 3,553 Money." *Id*; *see also*, Docket No. 56, Exhibit No. 3 at 7. Upon this finding,

the Defendant claimed that it was not his and it belonged to an individual referred to as "Burro."

While waiting for the vehicle to be towed, the PRPD Agent "notified an ATF agent of his

seizure of two silencers. The PRP[D] Agent also mentioned defendant's allegation that the items

---

[2] "The use of one-way glass for the windshield and glass windows of vehicles or motor vehicles, as well as any other tint that prevents vision through the windshield of vehicles or motor vehicles, is hereby prohibited. The altering thereof by applying tints and any other material or product used as a solar filter on the windshield and windows of motor vehicles to produce a percentage of transmission of visible light of less than thirty-five percent (35%) is likewise prohibited." P.R. Laws Ann. tit. 9, § 5285.

belonged to 'Burro'." Since codefendant, Carlos David Osorio-Perez, a.k.a. "Burro" was the target of an ATF firearms trafficking investigation, ATF agents expressed interest in interviewing Olivera. *See id.* Once the vehicle the Defendant was driving was towed, he and the vehicle were taken to the Carolina Motorized Unit (hereinafter, "CMU") for evidence processing. *See id.* When documenting the evidence seized, the PRPD Agent realized that the rifle magazine he had originally seen in the fanny pack was unloaded. *See id.*

The PRPD Agents provided Olivera with written *Miranda* warnings which were signed on December 15, 2020, at 3:07 p.m. while waiting for the arrival of the ATF Agents. *See id.*; *see also* Docket No. 56, Exhibit No. 4. Several minutes later, namely, at 3:30 p.m., the agents obtained written permission to search Olivera's phone. *See* Docket No. 56, Exhibit No. 5. However, the PRPD Agent did not interview the Defendant other than asking him for biographical data and did not search his phone. *See id.*

The ATF Agents arrived at the CMU. The ATF Agents initiated a recorded interview which began with the reading of the *Miranda* warnings. According to the Government, "[a]fter each right was read, defendant verbally indicated that he understood and initiated the document next to each [warning]. Then, he knowingly signed the waiver at 7:10 p.m. and indicated that he wanted to speak with the ATF agents." Docket No. 56 at 3; *see* Docket No. 56, Exhibit No. 6. The Government claims that during the interview, the "Defendant admitted that the items seized had been sent by codefendant [1] Carlos David Osorio-Perez from Florida to Puerto Rico via the United States Postal Service to be sold in Puerto Rico. Olivera-Rivera admitted having sold 20-25 firearms for Osorio-Perez but indicated that he was aware that others were also selling the firearms Osorio-Perez was sending." *Id.* at 3. The Defendant "went on to explain Ocasio-Perez's

modus operandi to include that he would send firearms to his aunt (co-defendant Perez-Velazquez) where Olivera-Rivera would pick them up." *Id.*

After the Defendant's admission for firearms trafficking, the ATF Agents obtained a consent to search Olivera's phone. The Defendant then knowingly consented and signed the ATF consent form. *See* Docket No. 56, Exhibit No. 7. He "indicated that he wanted to speak with the ATF agents." Docket No. 56 at 3. As Olivera demonstrated willingness in cooperating with the ATF's investigation into Osorio-Perez, the Defendant was taken to the ATF offices where an extraction of his cellular phone was conducted and returned to him. Additionally, controlled calls were made by the Defendant to Osorio-Perez in the presence of ATF Agents. *See id.*

Upon the conclusion of the ATF Agents' intervention, "Defendant was allowed to leave with his phone, car and currency." *Id.* However, "[h]e would continue recording calls with Osorio-Perez." *Id.* The extent of his cooperation was such that it "allowed agents to seize parcels and firearms sent by Osorio-Perez." *Id.*

The Court begins by noting that the fact that the Lexus RX300 had tinted windows is sufficient to provide PRPD Agents reason to believe the Defendant was violating at least one Puerto Rico traffic law and to order the driver to stop. *See* P.R. Laws Ann. Tit. 9, § 5285. As evidenced by the Ticket for Administrative Infraction filed in support thereof, the Lexus RX300's tints had 15% transmission of visible light, way below the 35% percent authorized by Puerto Rico law. *See* Docket No. 56, Exhibit No. 1. Thus, because "it was objectively reasonable for [PRPD agents] to conclude that a traffic violation had occurred," the Court concludes the stop of the Defendant's Lexus RX300 was lawful. Southerland, 486 F.3d at 1358.

It is well recognized that "[a] pretextual traffic stop violates the Fourth Amendment." However, "[i]t is well established . . . that any traffic violation, no matter how minor, provides a police officer with probable cause to stop the driver of the vehicle." United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995). But ultimately, "[t]he subjective intentions of an officer making the stop are irrelevant for the purpose of determining the validity of the stop." United States v. Alcantar, 271 F.3d 731, 736 (8th Cir. 2001) (*citing* Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

Under these circumstances, the PRPD Agent's traffic stop as a result of the Defendant's violation to Puerto Rico law, to wit, tinted windows with 15% visibility as opposed to 35%, the lowest percent allowed, was objectively reasonable. *See* Arizona v. Johnson, 555 U.S. 323, 327 (2009); *see also* Docket No. 56, Exhibit No. 1. Accordingly, the traffic stop was lawful, and the first Terry condition is satisfied. *Id.* at 326–27 (holding that "in a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation."). In any event, the Defendant "does not contest that he was traveling in a vehicle with illegal window tints, he violated Law 22 and the agents properly stopped him to issue the corresponding fine." Docket No. 56 at 10.

## B.   *Standing*

The second Terry condition requires the Court to examine the *reasonableness of the search*. *See* Arizona v. Johnson, 555 U.S. 323, 326–27 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably

suspected of criminal activity, *the police must harbor reasonable suspicion* that the person subjected to the frisk is armed and dangerous.") (emphasis ours).

However, before reaching the second step of the <u>Terry</u> test, the Court must first evaluate whether the Defendant has standing to challenge the search following the traffic stop. Consequently, if the Defendant lacks standing, the Court must not analyze the second <u>Terry</u> condition. Thus, to fulfill the standing requirement, the Defendant must show that he had subjective expectation of privacy when the agents ordered the traffic stop. (<u>U.S. v. Aguirre</u>, 839 F.2d 854, 856 (1st Cir. 1988) ("Before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized.")

As a threshold matter, a defendant must show that he has standing to challenge the search. <u>Aguirre</u>, 839 F.2d at 856 (internal citations omitted). In order to establish standing, a defendant must demonstrate a "legitimate expectation of privacy in the area searched or the item seized." <u>United States v. Vilches-Navarrete</u>, 523 F.3d 1, 13 (1st Cir. 2008) (internal citations omitted). To succeed, the defendant "must show that he had both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." *Id.* (citing <u>California v. Greenwood</u>, 486 U.S. 35, 39 (1988)); *see* <u>United States v. Rheault</u>, 561 F.3d 55, 59 (1st Cir. 2009).

In the context of a vehicle search, a defendant must show "a property [or] a possessory interest in the automobile" to establish a reasonable expectation of privacy. <u>U.S. v. Symonevich</u>, 688 F.3d 12, 19 (1st Cir. 2012) That is, the defendant bears the burden of establishing "that he gained possession from the owner or someone with authority to grant possession." <u>U.S. v. Valdez</u>

Hocker, 333 F.3d 1206, 1208 (10th Cir. 2003). There is "no bright-line rule that governs whether a person has a reasonable expectation of privacy in vehicle; instead the court considers a number of factors." U.S. v. Almeida, 748 F.3d 41, 47 (1st Cir. 2014). Namely,

> [o]wnership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. We look, in short, to whether or not the individual though of the place (or the article) as a private one, and treated it as such.

*Id.* (*citing* Aguirre, 839 F.2d at 856-57).

Here, the Government avers that "the Lexus vehicle from which the evidence was seized was not registered to Defendant. *See* Docket No. 56, Exhibit No. 2. Additionally, when intervened, Olivera told the PRPD Agents that the evidence seized belonged to "Burro." *Id.* Ultimately, "[i]n his motion (incorporated into his affidavit) defendant fails to claim ownership of the vehicle or any of the items seized." *Id.* Therefore, Olivera has failed to meet the burden of establishing standing to challenge the legality of the search as to the Lexus RX300.

Moreover, the Defendant has failed to show a pattern of repeated use or control over the vehicle that would allow the Court to conclude that his possession of the vehicle was anything more than "informal and temporary." U.S. v. Sanchez, 943 F.2d 110, 113-14 (1st Cir. 1991) (holding defendant lacked standing when he "had only casual possession of the car.") Considering there is no evidence or assertion presented by the Defendant demonstrating "the responsibility or control [he] had over the automobile other than the fact that he was driving it when stopped", U.S. v. Lochan, 674 F.2d 960, 965 (1st Cir. 1982), the Court concludes the Defendant lacks standing to challenge the search. Accordingly, the Court finds that the Defendant does not have standing to challenge the search of the Lexus RX300.

*C.*    ***Plain view doctrine***

"The plain view doctrine allows officers to 'seize an item if they have a lawful right of access to the item seized and the object's incriminating nature is immediately apparent.' " United States v. Rodriguez, 711 F.3d 928, 936–937 (8th Cir.2013), citing United States v. Nichols, 344 F.3d 793, 799 (8th Cir.2003) (*per curiam*). The First Circuit has delineated the three elements of the plain view doctrine, namely: "the officer must lawfully have reached the position from which he plainly could view the seized object;" "the seizure must satisfy the probable cause standard . . . and in the context of a Terry stop, the officer must be 'acting within the lawful bounds marked by Terry at the time he gained probable cause;" and lastly, "the plain view exception to the warrant requirement necessitates that the officer 'have a lawful right of access to the object itself." United States v. Jones, 187 F.3d 210, 219–221 (1st Cir.1999); *see also* Horton v. California, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); Soldal v. Cook County, 506 U.S. 56, 66, 113 S.Ct. 538, 121 L.Ed.2d. 450 (1992). Therefore, "police officers, at least under certain circumstances, may seize contraband detected during the lawful execution of a Terry search." Michigan v. Long, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

"As the [Supreme] Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief, that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543, 75 L. Ed. 2d 502 (1983) (emphasis ours) (internal citations omitted). In fact, "[t]he Supreme Court repeatedly has recognized that officers have a right of access to contraband that they discover while acting

within the bounds of a lawful <u>Terry</u> investigation." <u>Jones</u>, 187 F.3d at 221. "Thus, police may

perceive an object while executing a search warrant, or they may come across an item while

acting pursuant to some exception to the warrant clause." <u>Texas v. Brown</u>, 460 U.S. 730, 739, 103

S. Ct. 1535, 1541, 75 L. Ed. 2d 502 (1983). Hence, "probable cause requires only a probability or

substantial chance of criminal activity, not an actual showing of such activity." <u>Illinois v. Gates</u>,

462 U.S. 213, 245 n.13, 103 S. Ct. 2317, 2335, 76 L. Ed. 2d 527 (1983). Accordingly, "an officer

may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer

has a reasonable, articulable suspicion that criminal activity is afoot." <u>Illinois v. Wardlow</u>, 528 U.S.

119, 123, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000) (citing <u>Terry</u>, 392 U.S. at 1).

Most particularly, "Fourth Amendment law in some contexts recognizes a distinction

between a person's home and a person's car. For example, the Fourth Amendment permits a

slightly broader search pursuant to the arrest of the occupant of a vehicle and some warrantless

searches of vehicles are permitted even if there are not emergency circumstances." <u>St. Hilaire v.</u>

<u>City of Laconia</u>, 71 F.3d 20, 28, n. 8 (1st Cir. 1995). In fact, "[o]ne has a lesser expectation of

privacy in a motor vehicle because its function is transportation and it seldom serves as one's

residence or as the repository of personal effects. . . . It travels public thoroughfares where both

its occupants and its contents are in plain view." <u>United States v. Chadwick</u>, 433 U.S. 1, 12, 97 S.

Ct. 2476, 2484, 53 L. Ed. 2d 538 (1977), abrogated in other grounds by <u>California v. Acevedo</u>, 500

U.S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991).

But ultimately, the core of this matter is whether the objects seized after a warrantless

search triggered by a traffic stop detention are lawful under the plain view doctrine, as the

windows were lowered for the driver to respond to the PRPD Agent. After a thorough review of

the evidence presented by the Government, the Court finds the issue is foreclosed as the Defendant was not the owner of the vehicle and, hence, lacks a privacy interest. Additionally, Olivera's arrest is justified under probable cause, as when he opened the fanny pack, the PRPD Agent was lawfully next to the vehicle when the rifle magazine was displayed in plain view by Olivera. The PRPD Agent then proceeded to inquire the Defendant as to a permit to possess firearms, which he recognized he did not possess. It was then that the PRPD Agent had at least a reasonable suspicion to believe that evidence of a crime, namely, illegal possession of a firearm or ammunition under Puerto Rico law, was present and needed to be seized. Upon investigating further, numerous rounds of ammunition and 2 silencers were found and "probable cause to arrest the defendant solidified." Docket No. 56 at 13. Therefore, the PRPD had reasonable suspicion to arrest Olivera and the right to seize the magazine and potential firearm pursuant to Terry precedent and under the automobile exception, as correctly argued by the Government. *See id.* at 11.

**D.   *Knowing and Voluntary Admissions***

It has been well established that *Miranda* warnings must be communicated to a suspect before he is subjected to "custodial interrogation". U.S. v. Ventura, 85 F.3d 708, 710 (1 Cir. 1996). In other words, "[u]nder Miranda v. Arizona, 384 U.S. 436, 479 (1966), evidence obtained as a result of police interrogation prior to the defendant being read his '*Miranda* rights' cannot generally be used against the defendant in the prosecution's case in chief." *See* U.S. v. Materas, 483 F. 3d 27, 32 (1 Cir. 2007)(emphasis ours). "The Court in *Miranda* noted that the term 'custodial interrogation' signified 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any

significant way.'" *See* <u>Locke v. Cattell</u>, 476 F. 3d 46, 51 (1 Cir. 2007)(quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). The 'custodial interrogation' inquiry necessary demands the determination of its two subsidiary components: 1) custody, and 2) interrogation. *See* <u>Illinois v. Perkins</u>, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 2398, 110 L.Ed.2d 243 (1990). Basically, the custody determination is the initial, and generally, the central inquiry: it is the touchstone to the need for *Miranda* warnings. *See* <u>U.S. v. Quinn</u>, 815 F.2d 153, 160 (1st Cir. 1987). The ultimate determination as to custody is "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *See* <u>Thompson v. Keohane</u>, 516 U.S. 99, 100, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995)(*quoting* <u>California v. Beheler</u>, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)) (internal quotations omitted). Two essential inquiries need to be evaluated in order to ascertain said ultimate determination, namely:

> [t]he first inquiry—*i.e.,* what circumstances surrounded the investigation is distinctly factual and state court findings in response to that inquiry attract a presumption of correctness under § 2254(d).
> The second inquiry—*i.e.*, would a reasonable person have felt he or she was not al liberty to terminate the interrogation and leave—calls for application of the controlling legal standard to the historical facts and thus presents a "mixed question of law and fact" qualifying for independent review.

<u>Thompson</u>, 516 U.S. at 100, 116 S. Ct. at 459.

The second component is the interrogation. Interrogation refers to both express questioning and its "functional equivalent", including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect". *See* <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Thus, "[t]he 'functional equivalence' test does not turn on the subjective intent of the particular police officer but on an

objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances." <u>United States v. Taylor</u>, 985 F.2d 3, 7 (1st Cir. 1993).

In any event, as a procedural safeguard to the detained, the following measures must be followed prior to questioning:

> the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.

<u>Miranda v. Arizona</u>, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).

Moving on, "[a]fter an initial invocation of the right to remain silent, four factors are relevant to determining whether the resumption of questioning is permissible: (1) whether a reasonable period of time passed prior to the resumption, (2) whether the same officer resumed questioning, (3) whether the suspect received refreshed *Miranda* warnings, and (4) whether questioning concerned the same alleged crime." <u>United States v. Oquendo-Rivas</u>, 750 F.3d 12, 17–18 (1st Cir. 2014).

According to the Defendant, he "initially indicated he [would] not incriminate himself, [and] 7-8 hour[sic.] later interviewed by the ATF agents, without an attorney." Docket No. 54 at 12. However, the evidence submitted by the Government demonstrates otherwise. In any event, all relevant factors weigh against the defendant. The Court explains. The Defendant was first advised of his rights by PRPD Agents upon his arrest, which occurred at approximately 1:15 p.m. *See* Docket No. 56-1. Two hours later, at 3:09 p.m., the Defendant was given written *Miranda*

warnings which he initialized, filled out and signed. *See* Docket No. 56-4. No interrogation was performed by PRPD Agents other than background information.

Later, at 7:10 p.m., before being interviewed by ATF Agents, and approximately six (6) hours after he was advised of his rights verbally, the Defendant signed a *Miranda* warnings form. *See* Docket No. 56-6. Upon signing the document, the ATF Agents attempted to conduct another interview upon the Defendant. He agreed to be questioned and voluntarily provided information to the ATF Agents. Therefore, the requirement that a "reasonable period of time passe[s] prior to resumption" was met. Even if Olivera initially refused to incriminate himself with PRPD Agents, the questioning performed by a different officer and a different agency, namely, the ATF was a different scenario. Not only did he indicate he wanted to speak with the agents, but the investigation with federal agents was related to firearm trafficking, as opposed to his initial detention for possession of magazines, ammunitions, and silencers.

As all elements related to the resumption of questioning evidently have been met, the Court finds that the defendant knowingly and voluntarily waived his rights. Therefore, his statements to federal agents are admissible.

### E.  Consent to search cellular phone

Finally, the Defendant argues that the phone was seized without probable cause, and searched without a warrant. *See* Docket No. 54 at 12. As previously discussed, there was probable cause to arrest Rivera, hence, the seizure of the cell phone incident to his arrest is proper. As to the search of the cell phone without a warrant, the Court deems it proper and briefly explains.

Ordinarily, a cellphone may be seized incident to an arrest, but a warrant is required in order to search it. *See* Riley v. California, 573 U.S. 373, 403, 134 S. Ct. 2473, 2495, 189 L. Ed. 2d

430 (2014)(holding that "what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."). Ultimately, the officers can "seize the phones to prevent destruction of evidence but obtain a warrant before searching the phones." United States v. Henry, 827 F.3d 16, 28 (1st Cir. 2016). The Supreme Court provides the following standard in determining whether the search of a cell phone without a warrant is lawful:

> The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable. Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so. The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?

Fla. v. Jimeno, 500 U.S. 248, 250–51, 111 S. Ct. 1801, 1803–04, 114 L. Ed. 2d 297 (1991) (internal citations omitted); *see also* Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967).

While in principle the search of a cell phone requires a search warrant, the Court cannot overlook the fact that the Defendant consented to a search of his cell phone, not once, but twice, first before the PRPD Agents[3] and a second time before the ATF Agents. *See* Docket Nos. 56-5 and 56-7. As correctly argued by the Government, Olivera's "voluntary consent is an acceptable substitute for search warrant." Docket No. 56 at 19. The ultimate question is whether "voluntary consent has been obtained, either from the individual party whose property is searched, or from

---

[3] It is uncontested that the PRPD Agents did not search Olivera's phone.

a third party who possesses common authority over the premises." <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990).

Here, the Defendant has not rebutted the evidence submitted by the Government which shows that Olivera consented to the search of his cell phone in two separate occasions after *Miranda* warnings were provided and upon his voluntary waiver of rights. The search and extraction of the Defendant's phone was performed after the consent for the search was voluntarily signed and after the Defendant knowingly waived his rights. In any event, as the Defendant was cooperating with ATF Agents, seeking a warrant would have delayed his eventual release. Therefore, the Court deems that the search of the phone was proper.

## F.    *Exclusionary Rule*

Ordinarily, "[s]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." <u>United States v. Leon</u>, 468 U.S. 897, 918 (1984). Along these lines, the Supreme Court has held that,

> "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. <u>By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused</u>. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

<u>Michigan v. Tucker</u>, 417 U.S. 433, 447 (1974). (Emphasis ours). Accordingly, "[i]f the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth

Amendment." <u>United States v. Peltier</u>, 422 U.S. 531, 542 (1975). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009).

In the case at bar, there is no indication that the agents acted in bad faith when intervening and interviewing Olivera. Therefore, the Court finds that the Defendant fails to establish sufficient basis to warrant a suppression.

### III.   CONCLUSION

In view of the foregoing, the Defendant's *Amended Motion to Suppress* (Docket No. 54) is hereby **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of August, 2022.

*S/Daniel R. Domínguez*
Daniel R. Domínguez
United States District Judge